This is an appeal from a judgment of the Lucas County Court of Common Pleas which granted the motion for summary judgment/motion to dismiss of plaintiff-appellee, the state of Ohio, and thereby dismissed the petition of defendant-appellant, William T. Montgomery, for postconviction relief. Montgomery has assigned the following as error:
 "NO. I THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST APPELLANT MONTGOMERY AND DISMISSING APPELLANT MONTGOMERY'S POST-CONVICTION ACTION IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 2, 10 AND 16
OF THE OHIO CONSTITUTION.
 "NO. II THE TRIAL COURT ERRED IN DISMISSING MR. MONTGOMERY'S POST-CONVICTION PETITION WITHOUT GRANTING MR. MONTGOMERY'S REQUEST FOR DISCOVERY.
 "NO. III THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT MONTGOMERY AN EVIDENTIARY HEARING IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, NINTH, AND FOURTEENTH AMENDMENT [SIC] OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 1, 2, 9, 10, 16, AND 20 OF THE OHIO CONSTITUTION."
On March 25, 1986, the Lucas County Grand Jury returned a two count indictment charging appellant with the aggravated murders of Debra D. Ogle and Cynthia Tincher while committing or attempting to commit aggravated robbery, in violation of R.C.2903.01(B). Attached to each count were the specifications that the offenses were committed for the purpose of escaping detection, apprehension, trial or punishment for the offenses of aggravated robbery; that the offenses were committed as part of a course of conduct involving the purposeful killing of two or more persons; and that the offenses were committed while the accused was committing or attempting to commit aggravated robbery and that appellant was the principal offender or committed the offenses with prior calculation and design. Subsequently, appellant's trial counsel filed a demand for discovery which, in pertinent part, specifically demanded the results or reports of any scientific tests made in connection with the case and which were within the possession, custody or control of the state; and all evidence known or which may become known to the prosecuting attorney, which may be favorable to appellant and materially relevant to either guilt or punishment. On April 30, 1986, the state filed a response to appellant's discovery request which asserted in relevant part that there were no results or reports of scientific tests made in connection with the case available to or within the possession, custody or control of the state at that time and that there was no evidence presently known to the prosecuting attorney favorable to appellant or material to either guilt or punishment. Subsequently, in regard to a motion to compel discovery, the state asserted that it had provided appellant with sixty pages of discoverable material and that it had supplemented discovery at least twice since.
On September 29, 1986, the case proceeded to a jury trial at which numerous witnesses testified, including Glover Heard, who was also indicted for the aggravated murders of Ogle and Tincher but who pled guilty to one count of complicity to murder. Through those witnesses, the following key evidence was presented. On February 20, 1986, appellant purchased a Bursa .380 automatic handgun from Cleland's Gun Shop in Toledo, Ohio. This gun was subsequently identified as the weapon that was used to kill both Ogle and Tincher. At approximately 5:00 a.m. on March 8, 1986, after an apparent argument with his girlfriend, appellant went by taxi with Glover Heard to an apartment shared by Ogle and Tincher. Appellant was acquainted with the victims but Heard was not. At this time, appellant was wearing a dark blue pinstriped suit jacket that he had borrowed from Randolph Randleman, his uncle. Subsequently, appellant asked Ogle to give him a ride home. After Ogle agreed, she, appellant and Heard left in her car. Before arriving at the destination, however, appellant had Ogle stop the car. He then walked her into a wooded area along Hill Avenue in Toledo, Ohio, while Heard remained in Ogle's car, and then, for no apparent reason, appellant shot Ogle three times with the fatal wound inflicted while the gun was in direct contact with the top of her forehead. Appellant then returned to the car and he and Heard drove back to the girls' apartment. Appellant instructed Heard to take Ogle's car. Heard took the car but then abandoned it approximately one block from his residence. Appellant returned to the girls' apartment and shortly thereafter left with Cynthia Tincher in her car. After leaving the apartment, appellant had Tincher pull to the side of the road and thereupon shot her through the head from a range of twelve inches or less. Several witnesses testified that they saw a man of approximately appellant's height and weight leaving Tincher's car on the morning of March 8, 1986 at approximately 7:15. Those witnesses testified, however, that the person they saw was wearing a dark jacket with a hood pulled up around his face. Tincher's body was discovered in her car at the corner of Wenz and Angola Roads in Toledo, Ohio at approximately 7:30 a.m. on March 8, 1986. Appellant lives approximately one-half mile from that location. Thereafter, at approximately 12:00 noon on March 8, 1986, appellant, Heard and two friends, Sidney Armstead and Eric Wilson, got together to go to a mall. Appellant, however, was carrying a plastic bag and directed Armstead to first drive him to a dry cleaner. Armstead drove appellant to One Hour Martinizing where appellant got out of the car with the bag. Although they were unable to identify at the home and told officers that he knew the officers were looking for him and he wanted to talk about the homicide. He was then arrested and taken to the police station for questioning. During the interrogation, appellant initially stated that Heard had killed both girls with his, appellant's, gun. He then changed his story but ultimately admitted that he had gone to the girls' apartment for a ride home. He continued to insist, however, that Heard had killed the girls and that he did not know where Ogle's body was. Finally, however, appellant admitted that he might be able to show officers where Ogle's body was and stated that it was on Hill Avenue near a market. Officers then took appellant to Hill Avenue and ultimately to a wooded area that appellant identified as the location. Several officers began searching the area while Sergeant Larry Przeslawski stayed in a patrol vehicle with appellant. After the officers searched one wooded area for a few minutes, appellant told Sergeant Przeslawski to direct the officers to search a different wooded area. Within five minutes, the officers located the body of Debra Ogle.
At the conclusion of the trial, the jury found appellant guilty of the aggravated murder of Debra Ogle with the specifications that said action involved the purposeful killing of two or more persons and that appellant was the principal offender while attempting to commit aggravated robbery. The jury further found appellant guilty of the lesser included offense of murder of Cynthia Tincher. At the conclusion of the mitigation phase, the jury recommended that appellant be sentenced to death. The trial court agreed with the jury's recommendation and ordered appellant, employees of the laundry testified that on March 8, 1986, a black male showed them a soaking wet dark blue pinstriped suit jacket that he wanted cleaned in one hour. The employees explained that the jacket would have to dry out before it could be cleaned. They then hung the jacket to dry. One employee testified that as it dried, the jacket made a "brownish dripping mess on the floor." She further testified that the jacket was badly stained and that she had to clean the jacket three times using a chemical cleaner. She could not identify, however, what the stains were. Subsequently, the jacket was picked up. Several days later, police officers obtained the jacket from Randolph Randleman who identified the jacket in court as the one which he had loaned to appellant.
As stated above, on March 8, 1986 at approximately 7:30 a.m., Tincher's body was discovered in her car at the corner of Wenz and Angola. Soon thereafter, Ogle was listed as missing. The following day, however, Ogle's car was discovered behind an abandoned house at 1031 Norwood. Thereafter, on March 10, 1986, Crime Stoppers received a telephone call from a Michael Clark who was at that time incarcerated in the Lucas County Jail. Upon interviewing Clark, officers obtained the name of Glover Heard. Officers located Heard and from Heard they obtained the name of appellant. Officers then gained permission from appellant's mother to search her home, where appellant also lived. That search revealed a black leather jacket with a hood and the manual to the Bursa semi-automatic handgun. Subsequently, on March 12, 1986, officers went to Randolph Randleman's home in an attempt to locate appellant. At approximately 12:00 noon, appellant arrived that appellant be executed. On direct appeal to this court appellant raised sixteen assignments of error, all of which we found to be without merit. See State v. Montgomery (Aug. 12, 1988), Lucas App. No. L-86-395, unreported. Thereafter; appellant appealed his convictions and sentence to the Supreme Court of Ohio, where he raised thirty-two propositions of law. Upon consideration, that court affirmed appellant's convictions and death sentence. See State v. Montgomery (1991), 61 Ohio St.3d 410, certiorari denied (1992), 502 U.S. 1111. Subsequently, appellant filed an application for delayed reconsideration in this court in which he asserted that his original appellate counsel was ineffective for failing to raise twenty-nine additional assignments of error in his direct appeal. Upon review, we denied the application finding the matters raised to be res judicata or improperly raised before this court. SeeState v. Montgomery (Mar. 3, 1993), Lucas App. No. L-86-395, unreported.
On March 7, 1996, appellant filed in the court below a petition to vacate or set aside judgment and/or sentence pursuant to R.C. 2953.21. The petition listed seventy claims for relief[1] in which appellant asserted that he had been denied his rights under the Ohio and United States Constitutions. He also requested discovery, in order to fully develop and pursue his claims, and an evidentiary hearing. Appellant supported his petition with numerous exhibits, including Exhibits SS (copies of Grand Jury listings from February 24, 1986 to April 4, 1986) and TT (police records from the investigation of the murders of Ogle and Tincher) which appellant obtained through an R.C.149.43 public records request in 1992. In response to the petition, the state filed a motion for summary judgment/motion to dismiss. On December 31, 1997, the lower court filed findings of fact, conclusions of law and a judgment entry granting the state's motion for summary judgment/motion to dismiss and dismissing the petition without a hearing. It is from that judgment that appellant now appeals.
In his first assignment of error, appellant contends that the trial court erred in dismissing his petition for postconviction relief. Although appellant specifically addresses the trial court's treatment of ten causes of action raised below, through a footnote in his brief and in his reply brief, appellant articulates that this assignment of error is intended to challenge the trial court's treatment of all seventy causes of action raised below and that in no way has he waived the claims not specifically addressed in his brief. Accordingly, we must address the trial court's treatment of all seventy claims.
The version of R.C. 2953.21 in effect when petitioner filed his petition read in pertinent part as follows:
 "(A)(1) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of his rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposes sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.
"* * *
 "(C) * * * Before granting a hearing, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition and supporting affidavits, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript. * * * If the court dismisses the petition, it shall make and file findings of fact and conclusions of law with respect to such dismissal."
Moreover, R.C. 2953.21(D) provides that "either party may move for summary judgment" in a postconviction relief proceeding. Summary judgment shall be granted if there is "no genuine issue as to any material fact, and there is no substantial constitutional issue established." State v. Milanovich (1975),42 Ohio St.2d 46, paragraph two of the syllabus.
It is well-established that res judicata is a proper ground upon which to dismiss, without a hearing, a petition for postconviction relief. State v. Perry (1967), 10 Ohio St.2d 175. See, also, State v. Cole (1982), 2 Ohio St.3d 112. Specifically, the court in Perry, held at paragraph nine of the syllabus:
 "Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment." (Emphasis in the original."
In addition, the doctrine of res judicata is applicable to constitutional issues raised in a petition for postconviction relief.
 "Constitutional issues cannot be considered in postconviction proceedings under Section 2953.21 et seq., Revised Code, where they have already been or could have been fully litigated by the prisoner while represented by counsel, either before his judgment of conviction or on direct appeal from that judgment, and thus have been adjudicated against him." Id., at paragraph seven of the syllabus.
Accordingly, to avoid a finding of res judicata, a petitioner must submit evidentiary documents containing sufficient operative facts outside the record to demonstrate that he is entitled to relief. State v. Kapper (1983), 5 Ohio St.3d 36,38, certiorari denied (1983), 464 U.S. 856. In other words, the petitioner bears the initial burden of showing that the issue could not have been determined without resort to evidence outside the record on direct appeal, Cole, supra, at 114, and the petitioner is entitled to a hearing only if the allegations outside the record are not rebutted by the record of the original criminal prosecution. R.C. 2953.21(E)
Upon a thorough review of the record in this case, we conclude that Montgomery's claims for relief one through thirty-three, thirty-five through forty-seven, sixty-three, sixty-four, sixty-six, sixty-eight and sixty-nine are all issues that either were raised on direct appeal or delayed reconsideration or could have been raised on direct appeal or delayed reconsideration. Accordingly, the trial court properly dismissed these claims as being barred under the doctrine ofres judicata.
In his thirty-fourth claim for relief, Montgomery asserted that his conviction and/or sentence are void or voidable because the state "on appeal failed to prove beyond a reasonable doubt that any constitutional error which occurred during Petitioner's trial did not contribute to the conviction and sentence of the Petitioner." Initially we note that when the state is the appellee in an appeal, the state has no obligation to prove anything. Rather, it is the appellant who has the burden of proving reversible error. Moreover, it is well-established that postconviction proceedings are not the proper forum for challenging the proceedings in a higher court. See State v. Murnahan (1992), 63 Ohio St.3d 60, and State v.Mitchell (1988), 53 Ohio App.3d 117. Specifically, an action brought pursuant to R.C. 2953.21 can only address whether the petitioner's judgment is void or voidable due to constitutional errors occurring at the trial level. Accordingly, appellant's thirty-fourth claim did not assert a cause of action cognizable in postconviction proceedings and the trial court did not err in dismissing it.
In his sixty-seventh claim for relief, Montgomery asked the trial court to void his conviction and sentence "because the capital sentencers did not have before them relevant mitigating evidence. Namely, since his incarceration on 'Death Row' for the instant matter, Petitioner has maintained an excellent disciplinary record." As with the thirty-fourth claim for relief, the issue raised under this claim is simply not cognizable in postconviction proceedings. Montgomery essentially asserts that capital sentencers must consider a capital convict's post-sentence institutional disciplinary record as a mitigating factor in determining whether to impose the death penalty. In addition to the incongruity of this assertion, R.C. 2929.04(B), which sets forth the mitigating factors which are to be considered in determining whether or not to impose the death penalty, does not support Montgomery's position. Accordingly, the trial court did not err in dismissing the sixty-seventh claim for relief.
We now come to the heart of appellant's first assignment of error which challenges the trial court's dismissal of those claims for relief which alleged prosecutorial misconduct in the knowing and purposeful withholding of exculpatory evidence, the so-called Brady claims. Appellant supported these claims with police reports (Exhibit TT) which he obtained through a public records request in 1992. Appellant asserts that numerous documents in those police reports contain exculpatory evidence which the state did not provide to him in the initial trial court proceedings and that had he been provided with that evidence, the outcome of the trial would have been different.
Initially, we must point out that our review of the evidence submitted in support of the petition for postconviction relief failed to disclose any affidavit or evidence in support of appellant's assertion that he was never provided with the police reports at issue during the initial trial court proceedings. Nevertheless, because the record does reveal the state's assertion during the pre-trial proceedings that it provided defense counsel with over sixty pages of documents and because Exhibit TT is comprised of approximately one hundred fifty pages of police reports covering the investigation of the murders of Ogle and Tincher, we are compelled to address theBrady claims raised in the petition and in appellant's brief.
In Brady v. Maryland (1963), 373 U.S. 83, 87, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."
 "In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. This standard of materiality applies regardless of whether the evidence is specifically, generally or not at all requested by the defense." State v. Johnston (1988), 39 Ohio St.3d 48, paragraph five of the syllabus, following United States v. Bagley
(1984), 473 U.S. 667.
In Bagley, at 683, the court noted:
 "The reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response."
More recently, in Kyles v. Whitley (1995), 514 U.S. 419, the United States Supreme Court reaffirmed the Bagley standard for materiality. In light of this standard, we will now address the specific claims for relief raised by appellant.
In his forty-ninth claim for relief, appellant asserted that the state wrongfully withheld evidence that in a search of co-defendant Glover Heard's residence on March 12, 1986, police officers found a pair of tennis shoes with bloodstains on them. Appellant supports this claim with a police report (TT 1132) which contains the following narrative regarding that search:
 "Upon entering the house Det. Kurdys and Goetz went into the kitchen area and on the floor infornt [sic] of the sink area there was a pair of red and white high top tennis shoes on the floor. Det. Kurdys and Det. Goetz examined the shoes, without touching them and could see a small spot of blood on the lower portion of one of the shoes. We then called for Evidence technician, Ed Marok to examine and photograph same."
Further review of the evidence submitted in support of the petition, however, reveals that tests conducted on the tennis shoes failed to reveal the presence of blood. As such, there was nothing exculpatory about the shoes and the state's failure to disclose this evidence did not amount to an unconstitutional deprivation of a fair trial under Brady and its progeny. Accordingly, the trial court did not err in dismissing the forty-ninth claim for relief.
In his fiftieth claim for relief, appellant asserted that the state wrongfully withheld exculpatory evidence that on March 12, 1986 at approximately 1:30 a.m., Debra Ogle was seen alive in the parking lot of her apartment complex by seven witnesses who went to high school with her. Appellant supports this claim with a police report taken at approximately 2:30 a.m. on March 12, 1986. At that time, Debra Ogle was still considered missing although her car had been discovered abandoned behind a home several blocks from the home of the co-defendant Glover Heard. That report reads in relevant part:
 "PRO stated that he and several friends were at the Oak Hill apartments on Hill when they saw a Blue Ford Escort with Debbie Ogle driving around the complex. Later they again saw her as a passenger in same auto. Debbie Ogle waved to them as they knew her from Rogers High School. She was with white male with long side burns. She did not appear distressed."
The lower court concluded that this isolated information, recorded in the course of an ongoing investigation when all of the facts were still being pieced together and in the face of overwhelming evidence presented at trial that Ogle had been killed on March 8, 1986, did not undermine confidence in the outcome of the trial. We agree and conclude that the trial court did not err in dismissing the fiftieth claim for relief.
In his fifty-first claim for relief, appellant argued that the state wrongfully withheld exculpatory evidence that the stains found in the seat of Tincher's car were bloodstains. Appellant then argues that this evidence "contradicts the representations advanced by the State at trial that the stains found in Tincher's car were blood stains." This argument is clearly nonsensical and probably a misprint. Nevertheless, photographs submitted into evidence at the trial showed the inside of Tincher's car with a number of obvious bloodstains. Accordingly, appellant was apprised of this fact at trial, could have raised issues regarding it on appeal and is therefore precluded from raising them here. The court did not err in dismissing the fifty-first claim for relief.
In his fifty-second claim for relief, appellant asserted that the state wrongfully withheld exculpatory evidence that stains found on the dark blue pinstriped jacket were in fact saliva stains and not bloodstains, as represented by the state at the trial, and that, despite the state's representations to the trial court, testing was in fact done on the coat which came back negative for the presence of blood. Appellant supports this claim with a copy of a police report which documents the testing done on the coat and indicates no presence of blood on the coat. Initially, we note that the police reports at issue do not demonstrate that the stains on the jacket were saliva stains. Rather, they reveal that upon questioning by police officers, Gayle Grove, an employee of One Hour Martinizing, stated that the stains resembled saliva. Grove also testified at the trial. Prior to defense counsel's cross-examination of her, counsel moved pursuant to Crim. R. 16 (B) (1) (g) to review the police report documenting Grove's statement to police. Accordingly, the record is clear that defense counsel did see Grove's statement that the stains resembled saliva during the trial and we cannot conclude that it was withheld from the defense.
Regarding the test results of the jacket, the following occurred at the trial. Judy Fisher, another employee of the cleaners, testified on direct examination that when she hung up the jacket to dry, it was "putting a yellowish brown, brownish dripping mess on the floor." She further stated that the jacket and lining contained a number of yellow, light brownish stains that did not show up very well and that she had to clean it three times with a chemical cleaner. She could not, however, identify what the stains were. Subsequently, on redirect examination, the following occurred:
 "Q. You stated on cross-examination that you know what type of chemical you use and what it's generally used for?
"A. Yes, sir.
"Q. And what is it generally use for?
 "MR. WINGATE: I'm going to object. May we approach?
"MR. YAVORCIK: Within the scope, your Honor.
 "(Whereupon, the following discussion was held at the bench and out of the hearing of the jury.)
"THE COURT: What's she going to say?
"MR. BATES: I don't know, he brought it up.
 "MR. YAVORCIK: I think she'll give a — pardon the expression — laundry list of the various substances that it will take out.
 "MR. WINGATE: I think what they want her to say is b-l-o-o-d.
 "THE COURT: I assumed that. Do you have anybody else that analyzed this?
 "MR. YAVORCIK: Can't analyze it after it's been dry-cleaned.
 "THE COURT: So, you don't have it from anyone else?
"MR. YAVORCIK: (Indicating in the negative.)
"THE COURT: I don't think I can let her answer.
"MR. YAVORCIK: Okay."
Accordingly, the court refused to allow the state to draw the inference that there was blood on the coat if the state did not have any evidence that the substance on the coat was blood. The court therefore sustained the objection and Fisher was not questioned any further. In the state's closing argument, however, the state directed the jury's attention to Fisher's testimony that appellant brought in the soaking wet jacket that was dripping a brownish-yellow substance. The state then further argued: "And then he leaves the coat there, dripping wet, for the weekend. Dripping with the blood of Debra Ogle." From these arguments, the state clearly, and despite the court's refusal to allow it to do so, wanted the jury to draw the inference that the substance on the coat was blood. To counter the state's arguments, the defense, in its closing argument, stated:
 "The prosecution is going to tell you about a coat that was taken to the cleaners wet. The prosecution is going to tell you about stains. But remember what the stains were, ladies and gentlemen? She said that they were on the front, and she said that they were on the inside of the coat, the lining. On the inner lining on both sides of the pockets.
 "How do you reconcile that, ladies and gentlemen? Are you saying that blood is spattering all over the place? Is that how? Because that's the inference that the prosecution wants to take or make. There's been no testimony to that. But the inference that the prosecution wants to make is that this yellowish-brownish substance is blood or was blood stains that the cleaners had to get out. That is inference.
 "But you don't know that, ladies and gentlemen. * * * We're talking about proof beyond a reasonable doubt."
We cannot find that the state's failure to provide the defense with the test results from the jacket resulted in the unconstitutional deprivation of a fair trial underBrady and its progeny. As pointed out by the defense in his closing argument, the state presented no evidence at the trial that the yellowish-brownish substance was blood. The test results simply revealed that after the coat had been chemically cleaned three times there was no evidence of blood on it. Finally, despite appellant's protestations to the contrary, the state, in its closing argument, only once argued that the coat was "dripping with the blood of Debra Ogle." Other comments by the state simply refer to the fact, as testified to at the trial, that the coat was soaking wet when it was brought to the cleaners. We therefore do not find that there is a reasonable probability that the outcome of the trial would have been different had this evidence been revealed to the defense and the lower court did not err in dismissing the fifty-second claim for relief.
In his fifty-fourth claim for relief, appellant asserted that the state wrongfully withheld exculpatory evidence that on March 8, 1986, four witnesses, in addition to the three who testified at trial, saw Tincher's car on the corner of Wenz and Angola and described an individual very different in appearance from appellant running away from the car. Appellant supports this argument with the copy of a police report which summarizes calls received during the investigation of Tincher's murder. The four witnesses identified by appellant as having been withheld from him are Kathy Copeland, Thomas Caldwell, Barb Martino and Mary Jane Evener. The information obtained from Copeland reads: "Caller states that on the morning of 3-8-86 she did observe a black male running East on Airport. Subject was very dark complected and wore glasses." The information obtained from Caldwell reads: "Caller states that at about 0700 on 3-8-86 he observed a black male running on Angola toward Airport. Male was described as in his 20s * * * [illegible] with a hooded sweat suit." The information obtained from Martino reads: "Caller states she observed a black male on Angola near Reynolds at about 10:15 on 3-7-86." Finally, the information obtained from Evener reads: "Caller states she was driving her daughter to work on 3-8-86 at 0800. She states she observed a maroon car on the north side of the road apparently abandoned. She stated she observed a BM on the south side of the road and she dropped her daughter off at Angola Wentz [sic] and returned seeing the marked police cars with the maroon car but no black male was then present." We find nothing material about any of this evidence. Most of it is cumulative to the evidence presented at trial. The information obtained from Martino is irrelevant in that it reports an event that took place on March 7, 1986. Finally, although Evener reported seeing a maroon car on the north side of the road, the car was still there when the police arrived. Had it been suspicious, it surely would have been investigated. The fact that Heard also had a maroon car was purely coincidence. We cannot conclude that the state's failure to reveal this information undermined confidence in the outcome of the trial and the lower court did not err in dismissing the fifty-fourth claim for relief.
In his fifty-fifth claim for relief, appellant asserted that the state withheld material exculpatory evidence that on March 8, 1986 at approximately 7:30 a.m., a Tom Hager "saw a second car parked at the intersection of Wentz [sic] and Angola, and saw Tincher's car stop as if to meet with the first car." The only reference to Tom Hager in the police reports submitted by appellant is a report detailing the questioning of potential witnesses. The report regarding Hager's statement reads:
 "Mr. Hager is a W.M. 31 and walked over to where the police cars were at. He reported that he left his house aroung [sic] 0725 hrs. 3-8-86 to run up on Airport and get a paper and have breakfast. He said that when he came off Circleview he turned east on Angola. He said that he looked west and he did not recall seeing the victims [sic] car parked along the street. He said that just after he turned east on Angola, there is a large farm field. He said that there was a car pulled off the road about 20 feet into this field. Tom said that when he came back from breakfast, the car in the field was gone and the police were on the corner at the victims [sic] car."
As is evident from this report, there is no mention of a maroon car meeting Tincher's car. This evidence fails to meet the materiality requirement of Brady and its progeny and the lower court did not err in dismissing the fifty-fifth claim for relief.
Next, we will address the fifty-third, fifty-sixth, fifty-seventh, fifty-eighth and fifty-ninth claims for relief together. Appellant asserted that the state wrongfully withheld exculpatory evidence, contained in Exhibit TT, that police had received numerous reports that Tincher and Ogle were killed by a third suspect, an alleged "hit-man" for a drug cartel; that on March 8, 1986, neighbors heard unidentified male voices arguing all night long in the victims' apartment; that Tincher was terrified of her step-father, a Toledo police officer, who had allegedly sexually molested her and who was allegedly stalking her around the time of the murders; that prior to their deaths a witness observed both Tincher and Ogle as being nervous and upset, thus rebutting the state's representation at trial that this was a "spur of the moment" crime; and that Ogle and Tincher were killed by someone other than appellant and that Ogle's prior and current boyfriends were primary suspects in the murders. Upon review, we find that there is nothing material about this evidence. In light of the evidence at trial that appellant's gun was used to kill both girls, that appellant admitted being in the girls' apartment in the early morning of March 8, 1986, that appellant admitted asking Ogle for a ride home and that appellant showed officers the location of Ogle's body, we cannot say that there is a reasonable probability that the result of the trial would have been different had the evidence at issue been disclosed. Accordingly, the trial court did not err in dismissing the fifty-third, fifty-sixth, fifty-seventh, fifty-eighth and fifty-ninth claims for relief.
In his sixtieth claim for relief, appellant asserted that the state withheld evidence that Detective Marx, not Detective Przeslawski, was the author of all police reports in the investigation of the Ogle and Tincher murders. Appellant claims that had he known this during the trial, he would have been able to establish that the investigating officers had committed perjury and would therefore have been able to destroy their credibility. The record reveals that appellant's trial counsel were shown numerous police reports during their cross-examination of numerous witnesses and therefore knew or should have known that the reports were authored by various police officers. Appellant failed to establish that the suppression of this evidence undermined confidence in the outcome of the trial and the lower court did not err in dismissing the sixtieth claim for relief.
In his sixty-first claim for relief, appellant asserted that the state withheld information in its possession regarding how it obtained the alleged confession of co-defendant Glover Heard. Appellant argues that the state presented evidence at trial that it first suspected appellant in the murders when it received a call to Crime Stoppers on March 10, 1986 from an inmate in the Lucas County Jail, Michael Clark, who revealed that Heard had told him that he had seen two white girls murdered. Appellant then contends that at trial the state represented that based on this information, the police questioned Heard, who confessed to the crimes and implicated appellant. Appellant states that Exhibit TT reveals that in reality, Heard was not in the Lucas County Jail on March 10, 1986, that Clark told police he spoke with Heard by telephone, but that jail records reveal the telephones were not turned on at the time when Clark stated they were. Appellant asserts that had this information been revealed to the defense, it would have completely destroyed the credibility of Heard and Clark. Our review of the record fails to reveal any testimony presented by the state that Heard was ever in jail with Clark. Rather, the record reveals testimony that on March 10, 1986, as the result of a call to Crime Stoppers, police officers interviewed Clark in the Lucas County Jail and learned that Glover Heard had bragged about seeing two white girls killed. As a result of that interview, officers contacted Glover Heard and through him obtained the name of appellant. Appellant asserts that Exhibit TT establishes that this story is not credible. Exhibit TT contains the three police reports regarding Michael Clark. Exhibit TT, at 1149, reads in relevant part:
 "Michael Clark had conversation by phone with GLOVER HEARD on 3-8-86 at approximately 0900 hrs. while he was in the LCCC. He was told by Heard that he saw two girls age 19 20, shot. He did not go into detail with him.
 "Calrk [sic] attempted to have the information relayed to us and told several Lucas County Deputies at the LCCC but we were never contacted. Mr. Clark finally called on 3-10-86 at the Crime Stopper phone and gave the information to Sgt. Biegala who assigned Det. Ray Sifuentes the interview of Clark. See Det. R. Sifuentes Supplemental Report regarding his interview.
 "The information provided by Michael Clark was instrumental in breaking the case and resulted in the arrest of William Montgomery and Glover Heard. He stated that he will testify and be available when needed."
Next, Exhibit TT, at 1151, a report by Detective C.G. Perdeau, reads in relevant part:
 "On 3-11-86, I went to Lucas County Jail with Sgt. Preslawski [sic] and talked to Robert Roughten [sic]. We talked to him in an interview room at the booking area at the jail. Robert Roughton RID03533656 told us that he is doing time bor [sic] BE. He told us that on 3-8-86 Michael Clark was on the telephone and he could not recall if it was before or after lunch. He said that as soon as Clark hung up the phone, Clark told him that the guy he was talking to had just told him that he saw two girls get shot. Roughton said that Clark did not go into any detail about who he was talking to."
Finally, Exhibit TT, at 1156, documents Detective Perdeau's interviews with Mary Beth Stachura, a Lucas County Corrections Officer, and Deputy Corporal Sue Alex. That report reads in relevant part:
 "Mary Beth told me that on 3-8-86, she was working 4th floor south. Together [sic] we looked at the log for 3-8-86 and saw that the jail nurse signed in on the 4th floor at 0907 hrs. The nurse is a part time employee, Joan Sprow. She was on the 4th floor to pass out medication to prisoners. Mary Beth knew Joan and was going to accompany her on the floor.
 "As they started to make their rounds, Mary Beth said that Michael Clark came up to her and asked her, did you hear about the two girls that got shot in the head. He said something about the girls being in a bar before the shooting but Mary Beth said that she did not pay much attention to Michael, thinking that he was trying to get some information out of her. Mary Beth said that she told Michael that she had not heard anything about it and she told him that he could read all about it in the paper on Sunday, the next day.
 "Mary Beth told me that the telephones the prisoners use is [sic] turned on at the 4th floor control desk at 0900 hrs. on Sat. and Sun. She checked the log for 3-8-86 but there was no written record when the phone was turned on this date."
As is clear from these reports, nothing in the allegedly withheld evidence contradicts the testimony at trial. Moreover, the evidence only indicates that there was no record of whether or not the telephone was turned on. It does not establish that the phone was not turned on. As such, we cannot say that there is a reasonable probability that the result of the trial would have been different had this evidence been disclosed, and the lower court did not err in dismissing the sixty-first claim for relief.
In his sixty-second claim for relief, appellant asserted that the state wrongfully withheld exculpatory evidence that evidence had been manufactured against appellant by Detective Keefe Snyder in order to advance his racist agenda. In support of this claim, appellant submitted his own affidavit in which he states that on March 12, 1986, he was given a polygraph examination by Detective Snyder, that Snyder used racial epithets against him and that Snyder stated he would see appellant "go down for messing with white girls." Assuming the truth of this affidavit, appellant has still failed to produce any evidence that the Snyder manufactured evidence against him. Moreover, in that appellant himself was well aware of Snyder's statements prior to trial, he could have raised the issue in the original trial court proceedings. Accordingly, the trial court did not err in dismissing the sixty-second claim for relief.
In his sixty-fifth claim for relief, appellant asserted that the state engaged in prosecutorial misconduct throughout all phases of appellant's trial in that the state was in possession of material exculpatory evidence which it concealed from appellant. In that our review of the record and the evidence submitted below by appellant has failed to find anyBrady violations, the trial court properly dismissed the sixty-fifth claim for relief.
In his forty-eighth claim for relief, appellant alleged that because Exhibit TT demonstrates that he is factually and actually innocent, his conviction must be reversed. Nothing in Exhibit TT demonstrates that appellant is factually or actually innocent. Moreover, in the direct appeal of appellant's conviction and sentence, this court and the Supreme Court of Ohio both found that appellant's conviction was not against the manifest weight of the evidence. Accordingly, the trial court did not err in dismissing the forty-eighth claim for relief.
Finally, in his seventieth claim for relief, appellant asserted that the cumulative effect of the errors and omissions presented in his petition establish that he was deprived of a fair trial. Given our rulings rejecting the other sixty-nine claims for relief, we further find that the trial court properly dismissed the seventieth claim for relief.
Because appellant failed to demonstrate a genuine issue of material fact or a substantial constitutional issue, the trial court properly granted the state's motion for summary judgment/motion to dismiss and the first assignment of error is not well-taken.
In his second assignment of error, appellant asserts that the trial court erred in dismissing this petition without granting his request for discovery. It is well-established that although a petition for postconviction relief is a civil action, the procedures applicable to such an action are those found in. R.C. 2953.21 et seq. Those statutory provisions do not require the trial court to grant discovery during the initial stages of a postconviction proceeding. State v. Fox (May 16, 1997), Wood App. No. WD-96-031, unreported. Rather, "[i]t is petitioner's burden initially to submit evidentiary documents containing sufficient operative facts to warrant a hearing * * *." Statev. Rojas (Dec. 29, 1995), Hamilton App. No. C-950091, unreported, citing State v. Zuern (Dec. 4, 1991), Hamilton App. Nos. C-900481 and C-910229, unreported. The second assignment of error is not well-taken.
In his third assignment of error, appellant asserts that the trial court erred in denying his request for a hearing on his petition for postconviction relief. It is well-established that a petition for postconviction relief may be dismissed without an evidentiary hearing when the record indicates that the petitioner is not entitled to relief and that the petitioner did not submit evidentiary documents containing sufficient operative facts to demonstrate that substantive grounds for relief exist. Kapper, supra, at 38. As demonstrated above, the record indicated that appellant was not entitled to postconviction relief. Accordingly, the lower court did not err in dismissing the petition without a hearing and the third assignment of error is not well-taken.
On consideration whereof, the court finds substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
George M. Glasser, J. ------------------------- JUDGE
James R. Sherck, J. ------------------------- JUDGE
Richard W. Knepper, J. CONCUR. ------------------------- JUDGE
[1] The following is a summary of each of the claims alleged in Montgomery's petition for post conviction relief. Each claim alleges that Montgomery's conviction and/or sentence are void or voidable because he was denied his rights under various amendments to the United States Constitution and/or various sections of the Ohio Constitution. Herein we have summarized petitioner's bases for his constitutional claims solely as a reference for our opinion. To thoroughly review Montgomery's claims, please see the petition.
1. The state engaged in four specific instances of prosecutorial misconduct during the voir dire of petitioner's jury.
2. The state engaged in eight specific instances of prosecutorial misconduct during the culpability phase of petitioner's trial.
3. The state engaged in nine specific instances of prosecutorial misconduct during the penalty phase of petitioner's trial.
4. One of the jurors was biased against petitioner, irrational and incompetent to serve as a juror.
5. The jury was erroneously instructed that if it should find that no mitigating factors exist, or that the aggravating circumstances outweighed the mitigating factors, then it must sentence petitioner to death.
6. The state was allowed to present evidence during the penalty phase of the trial regarding petitioner's prior juvenile adjudications.
7. The trial court's sentencing opinion impermissibly took into consideration non-statutory aggravating circumstances while ignoring relevant mitigating factors.
8. The trial court denied petitioner's motion for continuance, thus forcing the case to proceed to the penalty phase on the day after the jury returned a verdict of guilty.
9. There was insufficient evidence presented at trial for a reasonable juror to find beyond a reasonable doubt that petitioner committed or attempted to commit aggravated robbery.
10. There was insufficient evidence presented at trial for a reasonable juror to find beyond a reasonable doubt that petitioner purposefully caused the death of Debra Ogle while committing or attempting to commit aggravated robbery.
11. The only direct evidence that petitioner killed either Debra Ogle or Cynthia Tincher came from the uncorroborated testimony of an admitted accomplice. At the time of petitioner's trial, R.C. 2923.03(D) dictated that no conviction could be based solely upon the uncorroborated testimony of an accomplice.
12. The trial court failed to instruct the jury on the lesser included offenses of voluntary manslaughter and involuntary manslaughter.
13. The trial court incorrectly charged the jury that the state had proven a death specification if they found beyond a reasonable doubt that petitioner purposefully killed Ogle and/or Tincher while committing aggravated robbery, and that petitioner was the principal offender in the aggravated robbery.
14. The trial court improperly instructed the jury on all seven mitigating factors found in R.C. 2929.04(B), despite the fact that petitioner only presented evidence on three of those factors.
15. The trial court improperly instructed the jury that in order to sentence petitioner to life in prison, it was necessary to reach a unanimous verdict.
16. The trial court erroneously instructed the jury that "reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge."
17. The state used peremptory challenges to exclude from the jury three members of the venire who expressed reservations about the death penalty despite those jurors' assertions that they could be fair and follow the court's instructions.
18. The trial court improperly refused to excuse for cause two venirepersons who harbored biases against petitioner.
19. The state was allowed to systematically eliminate African-Americans from the petitioner's jury.
20. The trial court did not require the state to provide a racially neutral reason for its use of a peremptory challenge after petitioner objected.
21. The trial court improperly excused for cause three jurors because of their expressed views on capital punishment.
22. The trial court erroneously charged the jury that "If a would is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon."
23. The trial court improperly precluded petitioner from introducing relevant mitigation evidence that mistakes can be made in our justice system.
24. The death sentence imposed upon petitioner was inappropriate and disproportionate to the nature of the crime of which he was convicted and to the leniency afforded his codefendant.
25. Petitioner's conviction and/or sentence are void or voidable because the trial court refused to grant petitioner's motion for a change of venue based on excess media coverage.
26. The state used the same underlying offense, aggravated robbery, both to elevate the killing of Ogle from murder to aggravated murder and to represent an aggravating circumstance in the penalty phase of the trial.
27. Petitioner was not afforded a fair proportionality review by either the trial court or any of the courts that have reviewed his appeal.
28. The capital punishment provisions of the Ohio Revised Code are unconstitutional on their face and as applied to petitioner.
29. The trial court refused to respond to a request for additional instructions from the jury.
30. The state was allowed to give the first and last closing arguments during the penalty phase of petitioner's trial.
31. The death penalty in Ohio is administered arbitrarily and capriciously and execution by means of electrocution is cruel and unusual.
32. The Ohio death penalty violates international laws and Article VI of the United States Constitution.
33. The grand jury proceedings were not recorded in violation of Crim.R. 22.
34. On appeal, the state failed to prove beyond a reasonable doubt that any constitutional error which occurred during petitioner's trial did not contribute to petitioner's conviction and sentence.
35. R.C. 2929.03(D) (1) is unconstitutional.
36. Petitioner was required to prove the existence of mitigation factors by a preponderance of the evidence.
37. Article I, Section 9 of the Ohio Constitution, which allowed the state to hold petitioner without bond, is unconstitutional.
38. Petitioner was illegally held without bond for five months pending trial.
39. Statements made by petitioner to police officers in response to interrogations should have been suppressed because they were made before petitioner was given hisMiranda warnings.
40. Petitioner was not adequately advised of hisMiranda warnings.
41. The trial court failed to maintain a complete record of all proceedings.
42. Neither the jury, the trial court nor the reviewing courts have considered the mitigating factor of extreme intoxication.
43. The jury erroneously considered the absence of statutory mitigating factors as non-statutory aggravating circumstances in the penalty phase of the trial.
44. The jury and trial court erroneously considered petitioner's juvenile adjudication for involuntary manslaughter to be a non-statutory aggravating circumstance in the penalty phase of the trial.
45. Petitioner was deprived of a fair and impartial jury in that two of petitioner's jurors were acquainted with police officers who testified for the state at trial.
46. Petitioner was deprived of a fair and impartial jury because one of the jurors was predisposed to automatically vote for the death penalty in all cases where the alternative was life in prison.
47. The state failed to prove that petitioner intended to permanently deprive Ogle of her motor vehicle and thus failed to prove the associated felony of aggravated robbery.
48. Petitioner is factually and actually innocent.
49. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that on March 12, 1986, during a search of the residence of co-defendant, Glover Heard, the police found a pair of Nike shoes which had bloodstains on them.
50. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that at approximately 1:20 a.m. on March 12, 1986, Debra Ogle was seen alive by seven witnesses, with whom she had gone to high school, in the parking lot of her apartment complex.
51. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that stains found in the seat of Tincher's car were bloodstains.
52. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that stains found on petitioner's jacket Were in fact saliva stains and not, as the state represented at trial, bloodstains.
53. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that police had received numerous reports that Tincher and Ogle were killed by a third suspect, an alleged "hit-man" for a drug cartel.
54. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that on March 8, 1986 four witnesses, in addition to the three who testified at trial, saw the car on the corner of Wenz and Angola in which Tincher's body was discovered and that these four witnesses described an individual very different in appearance from petitioner running away from the car.
55. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that on March 8, 1986, at approximately 7:30 a.m., a witness saw a second car parked at the intersection of Wenz and Angola and saw Tincher's car stop as if to meet that car.
56. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that on March 8, 1986, neighbors heard unidentified male voices arguing all night long in Tincher's and Ogle's apartment.
57. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that Tincher was terrified of her step-father, a Toledo police officer, who had once, allegedly, sexually molested Tincher and who was allegedly stalking her around the time of the murders.
58. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that prior to their deaths a witness observed both Tincher and Ogle as being nervous and upset, thus rebutting the state's representation at trial that this was a "spur of the moment" crime.
59. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that Ogle and Tincher were killed by someone other than petitioner and that Ogle's prior and current boyfriends were primary suspects in the murders.
60. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: that contrary to testimony at trial, Detective Marx, not Detective Przeslawski, was the author of all police reports in the instant matter.
61. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that its representation of how it obtained an alleged confession from co-defendant Glover Heard was a complete fabrication.
62. Evidence was manufactured against petitioner by Detective Keefe Snyder in order to advance his racist agenda. Snyder's claim that petitioner made inculpatory statements during a polygraph examination is therefore totally incredible.
63. Petitioner's trial counsel was ineffective in that they failed to adequately investigate in preparation for the penalty phase of petitioner's trial.
64. Petitioner's trial counsel was ineffective in that they failed to adequately investigate in preparation for the culpability phase of petitioner's trial and failed to uncover exculpatory information concealed by the state.
65. The state engaged in prosecutorial misconduct throughout all phases of petitioner's trial in that the state was in possession of material exculpatory evidence which it concealed from petitioner.
66. Petitioner's convictions and sentence are unconstitutional because of systemic racism existing in the capital charging system utilized by Lucas County.
67. The capital sentencers did not have before them relevant mitigating evidence of petitioner's excellent disciplinary record since his incarceration on death row.
68. Jurors were erroneously informed that their decision to sentence petitioner to death was only a recommendation.
69. Because of the existence of a sufficient amount of residual doubt, the aggravating factors cannot possibly outweigh the mitigating evidence presented in this case.
70. The cumulative effect of the errors and omissions presented in this petition establish that petitioner was deprived of a fair trial.